# IN THE UNITED STATE DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
*Alexandria Division*

| | |
|---|---|
| *JOHN DOE 2,* by and through his father and next friend, *JOHN DOE 1,*<br><br>        **Plaintiffs,**<br><br>    **v.**<br><br>*THE FAIRFAX COUNTY SCHOOL BOARD,*<br><br>        **Defendant.** | Civil Action No. 1:18-cv-00846<br><br>Judge Leonie M. Brinkema |
| **PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT** ||

# TABLE OF CONTENTS

Table of Authorities………………………………………………………………………..iv

Index of Exhibits…………………………………………………………………………..vi

I.   Issues presented………………………………………………………………1

II.  Introduction…………………………………………………………………..1

III. Relevant facts precluding summary judgment …………………………………...2

    A.   The girls'-basketball scandal rocked the Lake Braddock community, led to the removal of high-level staff members, and caused hypersensitivity and hypervigilance………………………………....…………………………………..3

    B.   Against this backdrop, three of Doe 2's crew teammates made accusations against him, and the school administrators—without bothering to investigate—accepted the allegations as true despite Doe 2's consistent denials of any intentional sexual misconduct or harassment…………………………………..……4

    C.   The administrator who collected the written statements from the accusers did not investigate their allegations………………………………………..…….……...5

    D.   The school district accepted the accusers' accusations as true without investigating or taking any steps to test their credibility given the seriousness of their accusations………………………………..…………………...…..6

    E.   Hoppock lied to the superintendent's hearing officers, who likewise accepted without question the accusers' accusations, offering Doe 2 no opportunity to test their credibility. ………………………………..… .……………………..……9

    F.   The Board rubber stamps the hearing result even though it was based on a woefully inadequate investigation. ………………………………..…………………12

    G.   Doe 2 has suffered serious emotional damage...…………………………..……12

IV. Law & argument………………………………………………………………13

    A.   Summary-judgment standard...………..………………………………………....13

    B.   The state-court appeal does not preclude Doe 2's claims in this case……………...13

    C.   Disputed issues of material fact preclude summary-judgment under both the erroneous-outcome and selective-enforcement theories of Title IX (Count 1)…….13

        1.   Doe 2 presents evidence that a school district reeling from criticism over the girls'-basketball scandal conducted a shoddy investigation that found him responsible……….…………………………………………...14

        2.   Doe 2 can likewise show that the school district was determined to make an example out of him after being crucified in the press for mishandling the girls'-basketball scandal…………………………………16

    D.   The Board denied Doe 2 procedural and substantive due process under federal and state law (Counts 3 and 4)…………………………………..…………….....16

           1.       The Board violated Doe 2's procedural due-process rights by failing to provide adequate notice, conducting a biased and incomplete investigation, and denying him appropriate safeguards in the hearing process (including the right to cross-examine his accusers)....................17

           2.       The school violated John Doe 2's substantive due-process rights by imposing a draconian penalty for juvenile banter.............................21

    E.     Doe 2 was sanctioned for his protected speech in violation of the First and Fourteenth Amendments, and Virginia's free speech clause (Counts 2 and 5)........................................................................................22

           1.       The Board engaged in First Amendment retaliation against Doe 2..........22

           2.       The SR&R is facially overbroad in that it purports to prohibit protected speech. ..........................................................24

           3.       The Board's policy is unconstitutional as applied.............................24

V.      Statement of Disputed Material Facts, As Enumerated by Defendant..................................................................................25

VI.     Conclusion ...........................................................................29

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)……..…………………………………….…..13

*Bates v. Sponberg*, 547 F.2d 325 (6th Cir. 1976)……..………………………………………….18

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986)...…..…………………………………….23

*Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) . ……………………………………………16, 17

*Carlucci v. Han*, No. 1:12CV451, 2013 WL 1948070 (E.D. Va. Apr. 17, 2013)………………………….…14

*Carlucci v. Han*, No. 1:12CV451, 2013 WL 1966898 (E.D. Va. May 10, 2013)………………………14

*City of Houston v. Hill*, 482 U.S. 451 (1987) . ………………………………………………24

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998)...…..……………………………….…………21

*Doe v. Allee*, 30 Cal.App.5th 1036 (2019)…………………………………………...…..21

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018) . …………………………………………….……21

*Doe v. Marymount Univ.*, 297 F. Supp. 3d 573 (E.D. Va. 2018)...…………………………………14

*Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018)………………………………………….....14

*Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602 (E.D. Va. 2016)…………...……13

*Doe v. Univ. of Mississippi*, 2019 WL 238098 (S.D. Miss. Jan. 16, 2019) . ……………………………21

*Doe v. Univ. of Southern California*, 29 Cal.App.5th 1212 (2019)...…………………………………21

*Doe v. Washington and Lee University*, 2015 WL 4647996 (W.D. Va. 2015)...…………………………14

*Eastern Auto Distributors v. Peugeot Motors of Am., Inc.*, 795 F.2d 329 (4th Cir.1986……………………………14

*Goss v. Lopez*, 419 U.S. 565 (1976)…………………………...……………………………16, 17, 20

*Grannis v. Ordean*, 234 U.S. 385 (1914)……………..…………………………………………17

*Hawkins. v. Freeman*, 195 F.3d 732 (4th Cir. 1999)...…………………………………………21

*Henson v. Honor Committee of Univ. of Va.*, 719 F.2d 69 (4th Cir. 1983)...…………………………17

*Huggins v. Prince George's Cnty.*, 683 F.3d 525 (4th Cir. 2012)...……………………………...………21

*J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915 (3d Cir. 2011)……………………………23

*Kerber v. Wayne Cnty. Employees Retirement Sys.*, 2019 WL 1354049 (E.D. Mich. Mar. 26, 2019………21

*Killion v. Franklin Reg'l Sch. Dist.*, 136 F. Supp. 2d 446 (W.D. Pa. 2001)……………………………24

*Klein v. Smith*, 635 F. Supp. 1440 (D. Me. 1986)………………………………………………24

*Kowalski v. Berkeley Cnty. Schs.*, 652 F.3d 565 (4th Cir. 2011)...……………………………………23

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789 (4th Cir. 2001)……………………………3

*Mathews v. Eldridge*, 424 U.S. 319 (1976)……………………………………………………17

*M.B. by & through Brown v. McGee*, 2017 WL 1364214 (E.D. Va. Mar. 24, 2017)……………………23

*McDevitt & St. Co. v. Marriott Corp.*, 713 F. Supp. 906, 933 (E.D. Va. 1989)………………………….....14

*Morse v. Frederick*, 551 U.S. 393 (2007)...………………………………………………………23

*Mullane v. Cent. Hanover Trust Co.*, 339 U.S. 306 (1950)...……………………………………………17

*Norris v. Univ. of Colorado, Boulder*, 2019 WL 764568 (D. Colo. Feb. 21, 2019)...………………………21

*Powell v. Montana State Univ.*, 2018 WL 6728016 (D. Mont. Dec. 21, 2018)…………………………21

*Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366 (4th Cir. 2013)……………………………….....14

*Richardson v. Town of Eastover*, 922 F.2d 1152 (4th Cir. 1991)...……………………………………20

*Rucker v. Harford Cnty.*, 946 F.2d 278 (4th Cir. 1991)...………………………………………17, 22

*Sansotta v. Town of Nags Head*, 724 F.3d 533 (4th Cir. 2013)...……………………………………17

*Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001)...…………………………………24

*Shanley v. Ne. Indep. Sch. Dist., Bexar Cty., Tex.*, 462 F.2d 960 (5th Cir. 1972)…...………………………24

*Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140 (4th Cir. 2014)...……………………………21

*Swatch, S.A. v. Beehive Wholesale, LLC*, 888 F. Supp. 2d 738 (E.D. Va. 2012)...………………………3

*Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150 (4th Cir. 2014)…...……………………………3

*Tigrett v. Rector & Visitors of the Univ. of Va.*, 290 F.3d 620 (4th Cir. 2002)…….………………………18

*Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503 (1969)...………………………………23

*Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994)...…………….....…………….………………14, 16

**INDEX OF EXHIBITS**

Ex. 1: Declaration of William Park (Apr. 18, 2019)

Ex. 2: Declaration of John Doe 1 (Apr. 17, 2019)

Ex. 3: Declaration of Jane Doe 1 (Apr. 12, 2019)

Ex. 4: Deposition of Karl Kerns (Dec. 12, 2018)

Ex. 5: Deposition of Laura Waterman (Dec. 12, 2018)

Ex. 6: Declaration of John Doe 2 (Apr. 17, 2019)

Ex. 7: Deposition of J.D. Anderson (Nov. 15, 2018)

Ex. 8: Composite exhibit of accusers' handwritten statements (Student Statement Form, Student A (Feb. 9, 2018) (FCSB001683); Student Statement Form, Student B (Feb. 12, 2018) (FCSB001638–39); and Student State Form, Student C (Feb. 13, 2017) [*sic*] (FCSB001640)).

Ex. 9: Deposition of Nancy Rottenecker (Nov. 13, 2018)

Ex. 10: Deposition of Student B (Nov. 26, 2018)

Ex. 11: Deposition of Eileen Hoppock (Nov. 5, 2018)

Ex. 12: Deposition of Dana Scanlan (Board's 30(b)(6) designee) (Dec. 20, 2018)

Ex. 13: Deposition of John Doe 2 (Dec. 15, 2018)

Ex. 14: Board's Objection to Second Set of Production Requests

Ex. 15: Deposition of Student E (Dec. 13, 2018)

Ex. 16: Deposition of Nancy Kreloff (Nov. 15, 2018)

Ex. 17: Plaintiff's Notice of 30(b)(6) Deposition of Defendant Board (Dec. 17, 2018)

Ex. 18: Doe 2's Response to Board's Request for Admissions (Oct. 24, 2018)

Ex. 19: Rottenecker notes (Feb. 15, 2018) (FCSB001693)

## I.  ISSUES PRESENTED

**Title IX erroneous outcome.** To succeed on an erroneous-outcome claim, a plaintiff must show indicia of a flawed investigation, and a plausible link between the error and gender bias. After a sexual-harassment scandal in the girls'-basketball program, administrators failed to investigate the accusations against John Doe 2 by his female crew teammates—and lied about it during the disciplinary proceedings that found him responsible. Did the Board prove beyond factual dispute that he did all the things he was accused of doing?

**Title IX selective enforcement.** To prevail on a selective-enforcement claim, a plaintiff must prove that regardless of guilt or innocence, the penalty's severity or the decision to initiate proceedings was motivated by gender. Doe 2 was essentially expelled for making a handful of crude remarks. Did the Board prove beyond factual dispute that the girls'-basketball scandal splashed across the media had no impact on its decision to single out Doe 2 for a harsh penalty?

**Procedural due process.** Procedural due process requires a "meaningful hearing." Here, the school presumed the accusations' truth, gave him no reasonable notice of the accusations against him before questioning him, conducted a biased and incomplete investigation, lied to the hearing officers, and gave Doe 2 no opportunity to test his accusers' credibility. Taken together, could this evidence lead a reasonable jury to conclude that the Board denied Doe 2 a "meaningful hearing"?

**Substantive due process.** Substantive due process precludes penalties that shock the conscience. Does removing a teenage student from his public school for making a handful of bawdy comments shock the conscience?

**First Amendment.** Public-school administrators who punish students for protected speech are liable for First Amendment retaliation under § 1983, and policies that purport to allow them are unconstitutional. Here, Doe 2 was severely punished for an off-color joke without any suggestion that it disrupted the on-campus learning environment. Did the Board prove beyond factual dispute that Doe 2's First Amendment rights were not violated?

## II.  INTRODUCTION

The Board's motion ignores the girls'-basketball scandal that rocked the Lake Braddock Secondary School athletic community, resulting in the removal of the principal and other administrators and staff members. The former girls'-basketball coach had been accused of sexual harassment including making sexual comments to team members. The school initially ignored the player complaints, but then the parents got involved: like dominoes, the girls'-basketball coach was out, then the DSA, then the *football* coach, and finally—in the wake of a federal investigation that launched the scandal back into the news—the principal.

Lake Braddock's new principal was less than two weeks on the job when three of John Doe 2's crew teammates made accusations against him. With the electricity of the girls'-basketball scandal coursing through the hallways, conditions were ripe for the kind of knee-jerk overreaction that occurred here. A reasonable investigation would have revealed that Doe 2 never intentionally touched anyone inappropriately. And what would normally be seen as ribald banter among teens—warranting at most oral cautioning—instead resulted in suspending a straight-A student, relegating him to an "alternative" school, and then banishing him to another high school; thus disrupting his academic, social, and extracurricular life—and diminishing his educational and career prospects.

Doe 2 has consistently denied touching any of his classmates in a sexual way, specifically denying intentionally touching anyone's crotch, breast, or buttocks. Given the competing accounts, Doe 2 was entitled to an opportunity to test his accusers' credibility. But that never happened. The school accepted the accusers' accounts as gospel, looking only to bolster them. Absent sufficient safeguards, Doe 2 became a sacrificial lamb on the altar of symbolic enforcement. He did nothing that would warrant dismissing him from his school, disrupting his peer relationships, interrupting his coursework, and permanently marring his record with the stain of sexual-misconduct allegations.

As detailed below, the school grasped for reasons to believe the accusers, find him guilty, and make a show of sanctioning him. But the Board's failure to properly handle the girls'-basketball scandal cannot justify its decision to bring down the hammer on Doe 2. Based on what he acknowledged doing, there was no basis to suspend him, let alone banish him from Lake Braddock.

### III. RELEVANT FACTS PRECLUDING SUMMARY JUDGMENT[1]

#### A. The girls'-basketball scandal rocked the Lake Braddock community, led to the removal of high-level staff members, and caused hypersensitivity and hypervigilance.

According to local and national media reports, on December 18, 2015, a girls'-basketball

---

[1] Doe 2's statement of disputed material facts appears in section V below.

player reported sexual harassment by Coach John Giannelli to then-director of student activities (DSA) Mike Clark.[2] The school did nothing.[3] Team parents complained in end-of-season reviews, blasting the school for ignoring sexual harassment.[4] Giannelli resigned on March 15, 2016, and then-principal Dave Thomas forced DSA Clark to resign that fall.[5] On his way out, Clark insisted that he had informed Thomas in 2015 about the allegations.[6]

Jim Poythress was the Lake Braddock football coach for 13 years and was the winningest coach in school history. But he apparently corroborated Clark's story about Thomas knowing about the allegations from jump street, making Poythress next on the chopping block.[7] Thomas forced Poythress to resign on March 7, 2017, and Poythress filed an EEOC retaliation complaint against the Board on May 9, 2017.[8] Giannelli, Clark, and Poythress were all gone. But Thomas remained.

Unsatisfied with the school's response, a girls'-basketball parent filed a complaint with the U.S. Department of Education Office for Civil Rights (OCR).[9] When the OCR accepted that complaint for investigation, it led to an exposé on WUSA Channel 9 on January 4, 2018.[10] Two of

---

[2] W. Park Decl. (Apr. 17, 2019) at ¶¶ 5, 16 (attached as **Ex. 1**); John Doe 1 Decl. (Apr. 17, 2019) at ¶¶ 6–7 (attached as **Ex. 2**); Jane Doe 1 Decl. (Apr. 12, 2019) at ¶ 15 (attached as **Ex. 3**).

[3] Park Decl. at ¶ 7. *See also* John Doe 1 Decl. at ¶ 7 (attaching media reports). The samples of media coverage attached to John Doe 1's declaration are admissible because they not offered for their truth, but rather to show that the girls'-basketball scandal was the subject of media coverage. *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001) (reversing trial verdict based on trial court's exclusion of newspaper reports offered to prove public perceptions rather than truth of reporters' statements); *Swatch, S.A. v. Beehive Wholesale, L.L.C.*, 888 F. Supp. 2d 738, 743 (E.D. Va. 2012), *aff'd sub nom. Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150 (4th Cir. 2014) (denying motion to strike as hearsay newspaper articles offered "for the purpose of showing that others knew of Plaintiff's brand").

[4] Park Decl. at ¶ 6 (attaching surveys). *See also* John Doe 1 Decl. at ¶ 7 (attaching media reports).

[5] Park Decl. at ¶11. *See also* John Doe 1 Decl. at ¶ 7 (attaching media reports).

[6] Park Decl. at ¶ 7 (attaching complaint to Board members). *See also* John Doe 1 Decl. at ¶ 7 (attaching media reports).

[7] Park Decl. at ¶ 10. *See also* John Doe 1 Decl. at ¶ 7 (attaching media reports).

[8] Park Decl. at ¶ 11; John Doe 1 Decl. at ¶ 7 (attaching media reports).

[9] Park Decl. at ¶ 9 (attaching OCR complaint).

[10] John Doe 1 Decl. at ¶ 7, Ex. 1 (video manually filed, available at https://www.wusa9.com/article/news/local/virginia/feds-investigating-virginia-school-after-sex-harassment-complaints-against-coach/65-504918719); Park Decl. at ¶ 16.

the former players, now graduated, gave interviews criticizing Lake Braddock's handling of the sexual-harassment allegations.[11] With the scandal in the news, the Board announced Thomas's immediate "retirement" effective February 2, 2018, and John Banbury became Lake Braddock's interim principal on February 5, 2018.[12] This set the stage for the accusations against Doe 2.

Karl Kerns, who was DSA after Clark and through the accusations against Doe 2, testified that the Lake Braddock administration "were hyper-sensitive to anything that was athletic related," acknowledging that the "negative publicity" about the girls' basketball team was to blame for the "hyper-vigilance."[13] Associate principal Laura Waterman, who came to Lake Braddock in February 2016,[14] also acknowledged awareness of the scandal, which began before she worked there,[15] and which continued and was covered in the media during her tenure.[16]

**B.  Against this backdrop, three of Doe 2's crew teammates made accusations against him, and the school administrators—without bothering to investigate—accepted the allegations as true despite Doe 2's consistent denials of any intentional sexual misconduct or harassment.**

During Doe 2's sophomore year, he had a 4.1 GPA and was a member of the crew team.[17] He had no disciplinary history.[18] His crew success was the source of some jealousy from Student E—a friend of accuser Student A and her brother Student D—whom Doe 2 had beaten out for a spot in the state-championship novice crew team their freshman year.[19] On Friday, February 9, 2018, Student A completed a written statement accusing Doe 2 of touching her inappropriately in the

---

[11] Doe 1 Decl. at ¶ 7, Ex. 1.

[12] Park Decl. at ¶¶ 11, 16; John Doe 1 Decl. at ¶ 7, Ex. 2.

[13] K. Kerns Dep. (Dec. 12, 2018) at 32–34, 77, 90, 95–97; *id.* at 98 (attached as **Ex. 4**).

[14] L. Waterman Dep. (Dec. 12, 2018) at 8 (attached as **Ex. 5**).

[15] Waterman Dep. at 56.

[16] *Id.* at 57 (admitting awareness of *Washington Post* article).

[17] Doe 2 Decl. (Apr. 17, 2019) at ¶ 7 (attached as **Ex. 6**).

[18] J.D. Anderson Dep. (Nov. 15, 2018) at 68 (attached as **Ex. 7**).

[19] Doe 2 Decl. at ¶ 5.

library three days earlier (on Tuesday, February 6): she claimed he had grabbed her butt, touched her crotch, and showed her his penis.[20] *She later admitted that he had not exposed himself to her.*[21]

On Monday, February 12, 2018, Student A accompanied Students B and C to also accuse Doe 2 of inappropriate behavior. Student B completed a written complaint alleging that Doe 2 had "nugged" [*sic*] the side of her breast in Spanish class and tapped her hip/butt.[22] She also complained that he said that she would cut herself if she fingered herself with her fake nails. Student C alleged that Doe 2 had grabbed his genitals through his spandex and made sexual statements at crew practice.[23] She claimed he asked her how a girl could insert a tampon without orgasming.

## C. The administrator who collected the written statements from the accusers did not investigate their allegations.

Nancy Rottenecker was an acting assistant principal from February 1 through June 30, 2018 during another employee's medical leave. Retired in 2012, she fills in for administrative employees during extended absences.[24] She served as the acting DSA in the fall of 2017 because the previous DSA did not properly handle the sexual-harassment allegations of the girls' basketball team.[25] She received no formal trainings since her retirement in 2012, and understood that Principal Dave Thomas had resigned in the aftermath of the girls'-basketball scandal.[26]

Rottenecker collected handwritten statements from the accusers on February 12, 2018, but didn't interview them.[27] She described her approach to receiving a complaint of misconduct from a

---

[20] Student Statement Form, Student A (Feb. 9, 2018) (FCSB001683) (the handwritten statements of Students A, B, and C are attached as **Ex. 8**).

[21] Hr'g Tr. (Mar. 9, 2018) at 28 (Board's Ex. A, Doc. No. 101-1 at 777).

[22] Student Statement Form, Student B (Feb. 12, 2018) (FCSB001638–39).

[23] Student State Form, Student C (Feb. 13, 2017) [*sic*] (FCSB001640).

[24] N. Rottenecker Dep. (Nov. 13, 2018) at 15–17 (attached as **Ex. 9**).

[25] *Id.* at 23–24.

[26] *Id.* at 17, 19, 30.

[27] Student B Dep. (Nov. 26, 2018) at 72 (attached as **Ex. 10**). The Court ordered the parties to postpone deposing Students A and C "pending further order" from the Court. Doc. No. 57.

student as follows: "That when a student comes in, you take everything seriously. And then you get information to see if you can corroborate what the student is telling you."[28] She admitted this was the only investigation of sexual misconduct in which she ever participated during her career.[29]

### D. The school district accepted the accusers' accusations as true without investigating or taking any steps to test their credibility given the seriousness of their accusations.

On Tuesday, February 13, 2018, assistant principal Eileen Hoppock assumed control of the "investigation." Like Rottenecker, Hoppock never interviewed any of the accusers.[30] The Board acknowledges that "at a minimum" the assistant principals "need to speak to any witnesses the accused student proffers."[31] Also in terms of minimum investigation requirements, the Board admitted that the assistant principals "certainly need to assess the credibility of each person involved."[32] But that never happened here.

Hoppock did not interview Student A about the alleged library incident.[33] Nor did Hoppock—despite father John Doe 1's repeated pleas and exhortations[34]—obtain the library sign-in sheet,[35] computer log-in data, or surveillance video to determine what witnesses might have been present when Student A claims Doe 2 touched her on February 6, 2018.[36] Rottenecker also admitted

---

[28] Rottenecker Dep. at 34.

[29] *Id.* at 47–50.

[30] E. Hoppock Dep. (Nov. 5, 2018) at 200, 210, 240-250 (attached as **Ex. 11**).

[31] D. Scanlan Dep. (30(b)(6) designee) (Dec. 20, 2018) at 212 (attached as **Ex. 12**).

[32] Scanlan Dep. at 220.

[33] Hoppock Dep. at 144.

[34] John Doe 1 Decl. at ¶¶ 9, 14–15.

[35] Hoppock Dep. at 199. The Board's counsel instructed its 30(b)(6) designee not to answer questions about library sign-in sheets. Scanlan Dep. at 255–56. The Board produced what it claimed was the sign-in sheet for February 6, 2018, but no witness authenticated it, and the signature purporting to be Doe's is not his signature. Doe 2 Decl. at ¶ 13; John Doe 1 Decl. at ¶ 16. He was not in the library with Student A on February 6. Doe 2 Decl. at ¶ 12; Doe 2 Dep. (Dec. 15, 2018) at 67 (attached as **Ex. 13**). The Board refused to produce sign-in sheets or log-in data. Board's Obj. to Second RFP, No. 2 (attached as **Ex. 14**). The Board also objected to providing surveillance footage of the library area. *Id.* at No. 1.

[36] Hoppock Dep. at 199.

she took no steps to determine who else was in the library when Student A claimed Doe 2 touched her.[37] Had they done so, they would have learned that Doe 2 was *not in the library on that date*.[38] These common-sense steps would have cast significant doubt on Student A's credibility. Hoppock admitted no one ever asked Student A if the incident happened as Doe 2 described it.[39]

Student B testified regarding her Spanish-class allegations that no school employees or administrators—including Rottenecker and Hoppock—spoke to her at all about her accusations.[40] Student B further testified that Rottenecker did not talk to Student A or Student C about their accusations when she collected written statements on February 12.[41] And as to Student C's allegations about Doe 2 at the crew practice grabbing his crotch, she claimed this alleged incident took place in front of a boat of eight students. But the school interviewed no one.[42] No one asked any of the accusers whether this was just an effort to get Doe 2 bounced from the crew team (as Doe 2 reported to Hoppock and Rottenecker on February 16).[43] The students to whom Hoppock did talk denied seeing Doe 2 do anything inappropriate, as did his Spanish teacher.[44]

On February 15, 2018, Hoppock pulled Doe 2 from class and questioned him without telling him who had accused him of what. The Board admits that "the student needs to be informed of the

---

[37] Rottenecker Dep. at 58–59.

[38] Doe 2 Dep. at 67–68.

[39] Hoppock Dep. at 167. *See also* Anderson Dep. at 98.

[40] Student B Dep. at 8 ("Q. All right. Can you – before, did you go and talk to any administrators about that complaint regarding [John Doe 2]? A. No. Q. Okay. Did you talk to any school employees about it? A. No. Q. When you actually made the complaint, did you talk to any school employees? A. No."); *id.* at 19–20 (testifying that Rottenecker never asked Student B any questions); *id.* at 38–39, 59 (testifying that Hoppock never spoke to Student B about her accusations) ("I've never talked to [Hoppock]"); *id.* at 67–68 (neither Rottenecker nor Hoppock asked when it happened or who else might have seen); and *id.* at 95 (no one asked her questions).

[41] *Id.* at 72.

[42] Hoppock Dep. at 145–46. *See also* Anderson Dep. at 132–33.

[43] John Doe 1 Decl. at ¶ 9; Doe 2 Decl. at ¶¶ 8, 11.

[44] Hoppock Dep. 130–31, 134 (students) and 97–98 (Spanish teacher).

allegations against him or her."[45] Despite this requirement, Hoppock gave Doe 2 no specifics and no names when confronting him with the vague accusation that he "behaved inappropriately with people on the crew team."[46] Despite the lack of notice, Doe 2 responded candidly to Hoppock's queries, denying any wrongdoing or intention to make anyone uncomfortable.

He acknowledged the things that had happened[47] and consistently disputed the accusations that were untrue, including that he had intentionally touched any classmate in a sexual way or on her private parts.[48] He described that Student A and he were jokingly poking *each other* when she lost her balance in the chair, and that a fleeting, accidental touching occurred (where exactly it occurred Doe 2 was not sure).[49] He left that meeting with no idea that there were two other accusers.[50] Despite no meaningful investigation, and Doe 2 denying all serious allegations of wrongdoing, the school suspended him for 10 days and referred him to the superintendent for further discipline.[51]

Despite desperate efforts by Doe 2's parents to determine what he was being accused of, Hoppock and Rottenecker provided nothing beyond vague hints at what he had supposedly done and insisted repeatedly that the allegations (whatever they were) had "all been corroborated."[52]

---

[45] Scanlan Dep. at 202.

[46] Doe 2 Dep. at 75–76.

[47] He admitted joking with Student B about cutting herself if she fingered herself with fake nails. Doe 2 Dep. at 82–83. He admitted talking to other male crew members about the girls' appearance. Doe 2 Dep. at 101 ("every boy in high school talks about those kind of things"). *See also id.* at 118 (describing the crew team as "a highly sexualized environment").

[48] Doe 2 denied ever speaking to Student C about tampons. Doe 2 Dep. at 88. He admitted to making the tampon comments to two friends, who laughed in response. *Id.* at 88–91. He denied ever touching Student A's bottom or making the statements she alleged. *Id.* at 54, 69–70. He denied directing his hand between her legs. *Id.* at 72.

[49] *Id.* at 53-54, 72. "And I poked her on the side where her hip area is. I'm not exactly sure where my hand landed because the chair was rocking back and forth. She was moving at the time. And then she came onto me and basically bearhugged my left shoulder. And I reach in and touched her beltline. And then she got up. She pushed me again. And then she said, she muttered a curse word under her breath, and then she said, 'Don't do that again,' and then walked away from the library."

[50] Doe 2 Decl. at ¶ 9.

[51] Banbury letter (Feb. 16, 2018) (FCSB000665–68) (Board's Ex. B, Doc. No. 101-3 at 1020–23).

[52] Jane Doe 1 Decl. at ¶¶ 5, 7, 10, 12; John Doe 1 Decl. at ¶¶ 8–10.

**E.** **Hoppock lied to the superintendent's hearing officers, who likewise accepted without question the accusers' accusations, offering Doe 2 no opportunity to test their credibility.**

On March 9, 2018, superintendent's hearing officers Nancy Kreloff and J.D. Anderson held a "hearing" attended by Doe 2, his parents and aunt, his attorney Amanda DeFede, as well as Hoppock, who presented hearsay accusers' accounts, and Associate Principal Laura Waterman, who attended as the principal's designee.[53] Kreloff, as lead hearing officer, was condescending and judgmental, cut off Doe 2 when he tried to explain himself, and refused to allow his parents to speak on his behalf or ask him questions.[54] She did not advise the family that she would cut off the hearing abruptly after 90 minutes.[55]

Hoppock lied repeatedly during the March 9 hearing: she falsely claimed that seven students had "witnessed and directly heard" Doe 2 make inappropriate comments, and also falsely claimed that she and Rottenecker had interviewed the accusers and found them credible:

> MS. KRELOFF: So how many students actually witnessed the inappropriate let's start with comments?
>
> MS. HOPPOCK: Sure. We had at least six, I believe seven students who said that they had witnessed and directly heard these comments.
>
> MS. KRELOFF: How many witnesses said they experienced or saw any inappropriate touching?
>
> MS. HOPPOCK: There were three specific incidents that I referenced. And in each instance, the only confirmed witness was the young lady—
>
> MS. KRELOFF: The victim.
>
> MS. HOPPOCK: —herself, yes.
>
> MS. KRELOFF: Okay. Would any of these students have a reason to lie about the comments or the touching?
>
> MS. HOPPOCK: Not to the best of my knowledge.
>
> MS. KRELOFF: Did you find your witnesses to be credible?

---

[53] Hr'g Tr. (Mar. 9, 2018) (Board's Ex. B, Doc. No. 101-1 at 768–813).

[54] Doe 2 Dep. at 157–58; John Doe 1 Decl. at ¶ 18; Jane Doe 1 Decl. at ¶ 15.

[55] John Doe 1 Decl. at ¶ 18; Jane Doe Decl. at ¶ 14.

> MS. HOPPOCK: I did. I also interviewed these students with one of
> the other assistant principals, and she too found their comments and
> their allegations to be founded or at least warranted.[56]

Despite not having interviewed any of the accusers, Hoppock assured the hearing officers that the accusers were credible. **Hoppock admitted during her deposition that her statements during the March 9 hearing were not true.**[57] Waterman testified that she did no independent investigation and that Hoppock handled this matter independently.[58] The comments Waterman made at the hearing about two boys confirming the accusers' accounts were based on what *Hoppock* put in the hearing packet,[59] which Hoppock later admitted was not correct.[60]

The hearing officers testified that they rely on assistant principals to conduct an impartial and thorough investigation, conduct interviews, determine credibility, and be accurate and truthful.[61] The hearing officers admitted to relying on Hoppock's false statements about the number of witnesses,[62] interviewing the accusers with Rottenecker,[63] and assessing the accusers' credibility.[64] The hearing officers accepted at face value what Hoppock and Waterman presented. Both Hoppock and Rottenecker now admit that they did not interview anyone together.[65] They never discussed whether they found the accusers credible.[66] And Student B—the only accuser Hoppock claimed to

---

[56] Hr'g Tr. at 16–17 (Board's Ex. B, Doc. No. 101-1 at 775).

[57] Hoppock Dep. at 244 (admitting her statement about the number of witnesses was "an error"); *id.* at 246–47 (admitting that she did not interview Student A or Student C); *id.* at 251 (admitting statement about male witness was wrong).

[58] Waterman Dep. at 27, 29, 43.

[59] *Id.* at 47. Student E testified that he did not see Doe 2 touch anyone inappropriately or make inappropriate comments. Student E Dep. (Dec. 13, 2018) at 12–13 (attached as **Ex. 15**).

[60] Hoppock Dep. at 251.

[61] Anderson Dep. at 33–34, 94; N. Kreloff Dep. (Nov. 15, 2018) at 28, 74 (attached as **Ex. 16**).

[62] Anderson Dep. at 119.

[63] Kreloff Dep. at 54 ("I assumed that what she was saying is that they, as a team, interviewed students, and that the Principal had determined that these people were accurate.").

[64] Anderson Dep. at 51, 120.

[65] Hoppock Dep. at 246–47; Rottenecker Dep. at 71.

[66] Rottenecker Dep. at 117–18.

have interviewed—denied that Hoppock (or anyone else) interviewed her.[67] One hearing officer admits that if Hoppock's statements were wrong, it would have affected his decision.[68]

Doe 2 never had an opportunity to test his accusers' credibility. At the March 9, 2018 hearing, he provided results from a Psychosexual Risk Assessment, two polygraph reports, and character-reference letters. Both hearing officers were unduly critical and dismissive of Doe 2's evidence. Anderson testified from his "many years of watching Law and Order" that he knows polygraphs are inadmissible.[69] He viewed the polygraph report with a critical eye he didn't use to assess Hoppock's account.[70] Kreloff likewise testified he was unsure of whether the polygraph would be "admissible in Court."[71] Neither Anderson nor Kreloff discounted Hoppock's double-hearsay about what the accusers asserted in their written statements—likewise "inadmissible in Court."

The hearing officers also cut off and contradicted Doe 2.[72] He was reticent to "backtalk" and was inclined to "just go along with what adults are saying."[73] An example of this can be found in the portion of the hearing where Doe 2 frankly acknowledged he and his male teammates would talk about their female teammates' buttocks, and that he found that appropriate amongst boys. For being someone in a school setting, Kreloff's response was remarkably out-of-touch with teenage parlance:

> MS. KRELOFF: "Why would you talk about girls in this manner even to boys?
>
> Doe 2: I guess everybody does it.
>
> MS KRELOFF: Everybody does it. I don't think everybody does it."[74]

---

[67] Student B Dep. at 38–39. *See also id.* at 8, 19–20, 59, 67–68, 95.

[68] Anderson Dep. at 120–21.

[69] *Id.* at 79–80.

[70] Anderson Dep. at 80.

[71] Kreloff Dep. at 64.

[72] Doe 2 Dep. at 104.

[73] *Id.* at 102.

[74] Hearing Tr. at 51.

Kreloff then ran out the clock on the hearing, giving no warning that the hearing would be abruptly curtailed and leaving sharply limited time for Doe 2's parents to ask him questions or talk about the evidence of their son's character and conduct that they brought with them to support him.[75]

On March 23, 2018, Kreloff issued a decision finding Doe 2 responsible for violating the student code of conduct by engaging in improper and offensive touching and sexual harassment.[76]

### F.  The Board rubber stamps the hearing result even though it was based on a woefully inadequate investigation.

On April 23, 2018, the Board denied Doe 2's appeal, rubberstamping the flawed outcome a 6-4-1 decision.[77] Doe 2 exhausted his administrative remedies.[78]

### G.  Doe 2 has suffered serious emotional damage.

Since he was first accosted by Hoppock, Doe 2 has battled anxiety and depression.[79] He has been at serious risk of, and monitored constantly for, self-harm.[80] He and his family have endured emotional and financial issues as a result of this situation.[81] His experience at the alternative school was "traumatic" and "horrible" as he lost peer friendships, educational opportunities, and extracurricular involvement.[82] He fears that his life is over and that his reputation and record will never recover from these false allegations.[83]

---

[75] John Doe 1 Decl. at ¶ 18; Jane Doe 1 Decl. at ¶ 14.

[76] Kreloff Dep. at 78-79.

[77] Board's minutes (Apr. 12, 2018) (FCSB000476) (Board's Ex. B, Doc. No. 101-2 at 831).

[78] Doc. No. 79 at 4–8.

[79] Doe 2 Dep. at 128–30; Jane Doe 1 Decl. at ¶ 16; John Doe 1 Decl. at ¶ 19.

[80] John Doe 1 Decl. at ¶ 19; Doe 2 Decl. at ¶ 18; Jane Doe 1 Decl. at ¶ 16–18.

[81] John Doe 1 Decl. at ¶ 19; Doe 2 Decl. at ¶ 17–18; Jane Doe 1 Decl. at ¶ 16, 18.

[82] John Doe 1 Decl. at ¶ 19; Doe 2 Decl. at ¶ 18; Jane Doe 1 Decl. at ¶ 17.

[83] John Doe 1 Decl. at ¶ 19; Doe 2 Decl. at ¶ 17.

## IV.   LAW & ARGUMENT

### A.   Summary-judgment standard

Plaintiffs stipulate to the standard articulated in the Board's motion, other than to underscore that, in ruling on a summary-judgment motion, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."[84] Defendants don't do that.

### B.   The state-court appeal does not preclude Doe 2's claims in this case.

Doe 2's claims are not precluded by the state-court proceedings, as set forth in his response opposing the Board's brief on preclusion.[85] He incorporates by reference his arguments and adds that, as Judge Ellis noted in *Doe v. Rector & Visitors of George Mason University*, "certain key facts about the process afforded to plaintiff are known only because of discovery in this action."[86] Those facts include Hoppock's belated acknowledgement that a number of critical statements she made to the hearing officers were not accurate,[87] and Student B's revelation that *no one* interviewed her.[88]

### C.   Disputed issues of material fact preclude summary-judgment under both the erroneous-outcome and selective-enforcement theories of Title IX (Count 1).

Disputed issues of material fact preclude summary judgment on Title IX liability under both erroneous-outcome and selective-enforcement theories. The Board refused to designate a representative to testify regarding the girls'-basketball topics detailed in Plaintiffs' 30(b)(6) notice[89] or regarding its procedures for investigating allegations of sexual misconduct under Title IX.[90] The

---

[84] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[85] Doc. No. 79.

[86] 149 F. Supp. 3d 602, 622–23 (E.D. Va. 2016).

[87] Hoppock Dep. at 244, 251.

[88] Student B Dep. at 8, 19–20, 38–39, 59, 67–68, 95.

[89] *See* 30(b)(6) deposition notice (attached as **Ex. 17**). The Board's counsel indicated at the deposition that Dana Scanlan was designated for topics 1–18, 20–30, 33, 34, 56–58. The Board gave no prior notice that the 30(b)(6) designee would not be prepared to cover all of the listed topics. No designee was ever provided for the remaining subjects. Scanlan Dep. at 11–12.

[90] *Id.* at 240.

Board should therefore be precluded from providing any testimony or other evidence—either in seeking summary judgment or at trial—regarding those subjects.[91]

> 1. **Doe 2 presents evidence that a school district reeling from criticism over the girls'-basketball scandal conducted a shoddy investigation that found him responsible.**

"To state a claim for erroneous outcome discrimination, a plaintiff must allege (1) "a procedurally or otherwise flawed proceeding"; (2) "that has led to an adverse and erroneous outcome"; and (3) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.""[92]

In *Doe v. Washington and Lee University*, an expelled male student brought a Title IX claim in the Western District of Virginia.[93] A female student accused Doe of sexual misconduct. The school's investigators did not interview two of his proffered witnesses, the hearing board relied only on summaries of witness statements the investigators memorialized, and he was not given a fair opportunity to question the accuser. He alleged that gender bias led the school to find him responsible, pointing to a Department of Education Office for Civil Rights press release from around the time he was accused that referred to colleges losing federal funding if they did not address sexual violence on campus and a later-debunked Rolling Stone article about an alleged gang

---

[91] *See* Fed. R. Civ. P. 37(b)(2) ("court … may issue further just orders ... prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence."); *Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366 (4th Cir. 2013) (affirming greater sanction of dismissal based on evasion of Rule 30(b)(6) obligations); *Carlucci v. Han*, No. 1:12CV451, 2013 WL 1948070, at *2 (E.D. Va. Apr. 17, 2013), report and recommendation adopted, No. 1:12CV451 JCC/TCB, 2013 WL 1966898 (E.D. Va. May 10, 2013) (noting order "that defendants be barred from introducing any evidence at trial for a topic which they refused to answer at deposition"); *McDevitt & St. Co. v. Marriott Corp.*, 713 F. Supp. 906, 933 (E.D. Va. 1989) (citing *Eastern Auto Distributors v. Peugeot Motors of Am., Inc.*, 795 F.2d 329 (4th Cir.1986)) ("A party cannot offer a Rule 30(b)(6) witness who professes ignorance or testifies vaguely at his deposition, but at trial seeks to offer more detailed testimony based on information acquired subsequent to the deposition.").
[92] *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994); *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573 (E.D. Va. 2018) (citing *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018)).
[93] 2015 WL 4647996 (W.D. Va. 2015).

rape at the University of Virginia. The Western District of Virginia found that, considering the totality of the circumstances—including the flaws in the proceedings and the climate in which the "investigation" took place—there was a plausible link between his expulsion and gender bias.

Here, the markers of a flawed investigation and an inhospitable climate are even stronger. As detailed above, no one interviewed the accusers or took other steps to corroborate their allegations or evaluate their credibility. Doe 2 likewise denied any misconduct. The only students Hoppock interviewed *denied* having witnessed any misconduct by Doe 2.[94] Nor did Hoppock interview other potential witnesses (like the other students in the library when Student A claimed Doe 2 touched her, the students with whom Doe 2 was rehearsing for his music performance on the day Student A claims he was in the library with her, the other students in Spanish class when Student B claimed Doe 2 touched her, or the two students with whom Doe 2 actually had a conversation about tampons). Despite Doe 2's family members urging them do so, Hoppock and other administrators also failed to collect objective evidence of what transpired, including surveillance video, computer log-in information, or sign-in sheets from the library.

The school district—its administrators, its hearing officers, and the Board itself—relied on Hoppock's false statements claiming to have interviewed the accusers and found them credible, and to have confirmed accounts with six or seven witnesses. The hearing officers were not only *lied to* by Hoppock, but were not provided with compelling exculpatory evidence—including surveillance video that would have shown that Doe 2 was not in the library when Student A claimed he touched her inappropriately—that was within the school's possession alone. All of this reckless investigative work took place *in the second week* of the new principal's tenure, with the old principal (and girls'

---

[94] Hoppock Dep. at 129–35.

basketball coach, and football coach, and DSA) having been forced to resign due to a highly publicized scandal about not taking female athletes' allegations of sexual misconduct seriously.

Construing all this evidence and drawing all reasonable inferences in Doe 2's favor, as the Court must—and Defendants don't—a reasonable jury considering the steps the school took (and failed to take) could conclude that the school was uninterested in evaluating the accusers' stories or testing their credibility in any way. Taken together, the myriad flaws in the investigation and hearing process warrant concern that Doe 2 was denied fair treatment. Coupling those flaws with the strong circumstantial evidence of gender bias supported by the girls'-basketball scandal provides sufficient evidence for the jury to plausibly infer that Doe 2's sex was part of the reason he was disciplined.

> **2.      Doe 2 can likewise show that the school district was determined to make an example out of him after being crucified in the press for mishandling the girls'-basketball scandal.**

To prevail on a Title IX selective-enforcement claim, an aggrieved student must prove that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate proceedings was affected by the student's gender."[95] In light of what Doe 2 actually did— make a handful of ribald comments—the penalty of permanent removal from his school was outrageous. Doe 2 testified that his female classmates are not punished for similar statements.[96] In light of the girls'-basketball scandal, a reasonable jury could conclude that the Board did not care one way or the other whether Doe 2 had done anything wrong, and instead were determined to make an example of him to show that the district was suddenly serious about harassment.

> **D.      The Board denied Doe 2 procedural and substantive due process under federal and state law (Counts 3 and 4).**

"[E]ducation is perhaps the most important function of state and local governments."[97]

---

[95] *Yusuf*, 35 F.3d at 715.
[96] Doe 2 Dep. at 109.
[97] *Goss v. Lopez*, 419 U.S. 565, 576 (1976) (quoting *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954)).

Exclusion from school "is a serious event in the life of the suspended child;" a school district "may not withdraw th[e] right [to public education] on grounds of misconduct absent fundamentally fair procedures to determine whether the misconduct has occurred."[98] At its core, due process requires fair notice and an opportunity to be heard.[99] "[D]isciplinary proceedings require more stringent procedural protection than academic evaluations"[100] And an outcome that shocks the conscience transgresses due-process requirements no matter how much formal "process" is provided.[101]

> 1. **The Board violated Doe 2's procedural due-process rights by failing to provide adequate notice, conducting a biased and incomplete investigation, and denying him appropriate safeguards in the hearing process (including the right to cross-examine his accusers).**

A procedural due-process claim requires a plaintiff to prove (i) that he possessed a protected liberty or property interest, (ii) that the state or its agents deprived him of this interest, (iii) without constitutionally sufficient process.[102] Doe 2 has a protected property interest in a public education.[103] He was deprived of this interest by suspension, reassignment to an alternative school, and permanent removal from Lake Braddock to another district high school.[104] And the procedures that led to these deprivations were not fundamentally fair.

The right to be heard is of little value without adequate notice of what one has been accused of doing.[105] The Supreme Court has held that "[a]t the very minimum," a student facing suspension must "first be told what he is accused of doing and what the basis of the accusation is."[106] Requiring

---

[98] *Id.*

[99] *Mathews v. Eldridge*, 424 U.S. 319 (1976).

[100] *Henson v. Honor Committee of Univ. of Va.,* 719 F.2d 69, 74 (4th Cir. 1983).

[101] *Rucker v. Harford Cnty.*, 946 F.2d 278, 281 (4th Cir. 1991).

[102] *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013).

[103] *Goss*, 419 U.S. at 576 (quoting *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954)).

[104] Letter from Anderson to Doe 2's parents (June 15, 2018) (Board's Ex. B, Doc. No. 101-4 at 1100).

[105] *Grannis v. Ordean*, 234 U.S. 385, 394 (1914); *Mullane v. Cent. Hanover Trust Co.*, 339 U.S. 306, 314 (1950).

[106] *Goss*, 419 U.S. at 582.

effective notice gives the accused student the opportunity to dispute the allegations and alert the school "the existence of disputes about fact and arguments about cause and effect."[107] The school may then "summon the accuser, permit cross-examination, and allow the student to present his own witnesses."[108] The touchstone of whether procedural due-process requirements have been met is whether the accused was afforded a "meaningful hearing."[109]

From the investigation's inception, Doe 2 was not notified of *who* accused him, or *what* specifically he was accused of doing. Hoppock ambushed Doe 2. She gave no notice of the charges against him before subjecting him to intense questioning without his parents present. He didn't even know who was accusing him of certain aspects of the allegations (e.g., he didn't know which student was accusing him of making the tampon comment because he did not have that conversation with Student C but with two friends who didn't complain about it and who the school didn't bother to interview). He then found himself responding to unclear accusations, and his acknowledgement he had a conversation with friends mentioning tampons (without objection)[110] was then twisted by Hoppock to suggest he admitted making such comments to one of the accusers—which was untrue.[111] He was suspended without appropriate notice or an opportunity to respond.[112]

The Board admitted in deposition that due process requires the school to "[i]nform student of the allegations and the facts known to school staff" is "absolutely part of the due process requirement, as is giv[ing] the student the opportunity to share his or her version of events."[113]

---

[107] *Id.* at 583–84.

[108] *Id.* at 584.

[109] *Tigrett v. Rector & Visitors of the Univ. of Va.*, 290 F.3d 620, 629–30 (4th Cir. 2002) (citing *Bates v. Sponberg*, 547 F.2d 325, 332 (6th Cir. 1976)).

[110] Doe 2 Dep. at 88–89; Hr'g Tr. at 47.

[111] Hr'g Tr. at 15, 46–48 (Doe 2 trying to explain that he didn't make the tampon comments to any of the accusers and explaining that he "wasn't sure who the person was that made the allegations.") (Board's Ex. B, Doc. No. 101-1 at 774, 781–82).

[112] Doe 2's Resp. to Board's Request for Admission No. 1 (Oct. 24, 2018) (attached as **Ex. 18**).

[113] Scanlan Dep. at 220.

Though he was later afforded a hearing, his rights never recovered from the initial deprivation, as Hoppock used his statements against him and treated him as having admitted to more than he actually did.

The school's failure to provide accurate notice from jump street hamstrung Doe 2 as he and his family scrambled to figure out what he was being accused of and how to respond. As vague snippets trickled out to them, they sought to counter the accusers' false statements any way they could. For example, Doe 2's father informed Hoppock on February 23, 2018 that Doe 2 was actually in rehearsals for a music performance with other students on the date when Student A alleged that he was in the library with her (February 6, 2018).[114] Hoppock nevertheless didn't interview those students. Nor did she try to locate other students who were in the library on February 6 (such as by reviewing the library sign-in sheets for that time period). Nor did she review the surveillance cameras from the library area. Had Hoppock tried to confirm Doe 2's whereabouts on the date Student A claimed he assaulted her and *showed her his penis* in the library, Hoppock would have confirmed that he wasn't even there that day. Had Hoppock questioned Student A about the false date and whether she had a motive to get Doe 2 removed from the crew team, her story may have unraveled. At the very least, it would have called her credibility into question.

Instead, Hoppock embraced the three girls' written accusations without question, and presumed Doe 2 was guilty from the start. She made every inference against him. From the biased "investigation," an erroneous outcome was inevitable. No one ever questioned the accusers about their accusations or motives. The school took no steps to test the accusers' credibility or motives (including whether they were talking openly in the hallway about trying to so do).[115] Doe was denied the opportunity to test their stories through any kind of cross-examination. Even by the time of the

---

[114] Doe 2 Dep. at 67–68; John Doe 1 Decl. at ¶ 14.
[115] Doe 2 Dep. at 58; John Doe 1 Decl. at ¶ 9.

hearing, John Doe 2 did not know who was accusing him of making the tampon comment, because Student C was in no conversation where he mentioned tampons.[116]

Though schools have some flexibility in their procedures, that operates on a sliding scale: the greater the potential deprivation, the more process is necessary.[117] Doe 2 has a substantial interest at stake when it comes to school disciplinary hearings for sexual misconduct. Being labeled a sexual harasser has both an immediate and lasting impact on his life. His record reflects that he was suspended, sent to an alternative school, and banished to a different high school. His relationships have suffered. He will face difficulty obtaining educational and employment opportunities down the road if his record is not corrected. On the Common Application used by most top colleges, he will have to report his discipline for something he did not do.[118] Yet rather than providing him with clear and unambiguous notice about what he was accused of doing, the Board dribbled vague snippets, leaving Doe 2 and his family at an unfair disadvantage in responding.

And most critically in this case, the Board's failure to conduct even the most basic interviews of the accusers—rather than relying entirely on their unsworn written complaints—left Doe 2 in the position of having no opportunity, directly or indirectly, to test his accusers' credibility. No one asked them whether this was just an effort to get Doe 2 kicked off the crew team.[119] These accusers did not believe he was sexually harassing them: indeed, the only one he was permitted to depose testified that she believed Doe 2 was gay.[120] Under the circumstances, Doe 2 was entitled to the opportunity to cross-examine him accusers.

---

[116] Doe 2 Dep. at 88–89; Doe 2 Decl. at ¶ 14.

[117] *Richardson v. Town of Eastover*, 922 F.2d 1152, 1159 (4th Cir. 1991) (citing *Goss*, 419 U.S. at 579).

[118] Doe 2 Decl. at ¶ 16–17.

[119] Student B Dep. at 23–24.

[120] *Id.* at 24. The Court ordered the parties to postpone deposing Students A and C "pending further order" from the Court. Doc. No. 57 at 369. The Court then *sua sponte* ordered that no further discovery take place.

The Sixth Circuit has recognized that in disciplinary proceedings where the case hinges on credibility, due process requires that an accused student or his agent have the opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder:

> Without the back-and-forth of adversarial questioning, the accused cannot probe the witness's story to test her memory, intelligence, or potential ulterior motives. Nor can the fact-finder observe the witness's demeanor under that questioning. For that reason, written statements cannot substitute for cross-examination.[121]

Other courts have followed the Sixth Circuit's lead, requiring that a student accused of sexual misconduct be afforded the opportunity to cross-examine adverse witnesses.[122] Providing Doe 2 with the opportunity to cross examine the accusers or even the assistant principal would have cost the Board nothing. Except the truth, to which it continues to show complete indifference.

Given the procedural failures detailed above, a reasonable jury could conclude that the Board denied Doe 2 procedural due process.

**2.    The school violated John Doe 2's substantive due-process rights by imposing a draconian penalty for juvenile banter.**

Substantive due process protects fundamental liberty interests from arbitrary government action.[123] "Only 'the most egregious official conduct' qualifies as constitutionally arbitrary."[124] Egregious conduct is that which "shocks the conscience"[125] and is 'unjustified by any circumstance

---

[121] *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018) ("if credibility is in dispute and material to the outcome, due process requires cross-examination.").

[122] *Powell v. Montana State Univ.*, 2018 WL 6728016, *7 (D. Mont. Dec. 21, 2018) (due process requires cross-examination to resolve competing narratives); *Doe v. Allee*, 30 Cal.App.5th 1036 (2019) (same); *Doe v. Univ. of Southern California*, 29 Cal.App.5th 1212 (2019) (same); *Norris v. Univ. of Colorado, Boulder*, 2019 WL 764568 (D. Colo. Feb. 21, 2019) (articulable doubt cast on proceedings by denial of cross-examination); *Doe v. Univ. of Mississippi*, 2019 WL 238098, *9–10 (S.D. Miss. Jan. 16, 2019) (favorably citing *Baum*'s cross-examination requirement). *Accord Kerber v. Wayne Cnty. Employees Retirement Sys.*, 2019 WL 1354049, *7 (E.D. Mich. Mar. 26, 2019) (pension-fraud case citing *Baum*'s holding cross-examination of witnesses may be warranted to choose between competing narratives).

[123] *Hawkins. v. Freeman*, 195 F.3d 732, 749 (4th Cir. 1999).

[124] *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 150 (4th Cir. 2014) (quoting *Huggins v. Prince George's Cnty.*, 683 F.3d 525, 535 (4th Cir. 2012)).

[125] *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies.'"[126]

A few isolated instances of adolescent banter cannot sustain a decision to remove scholarly Doe 2 from his high school and friends, and force him into a "alternative" school. A reasonable jury could conclude that the Board's decision to do so was unjustified by any circumstance or government interest regardless of any pre- or post-deprivation process afforded. For summary-judgment purposes, the Court must accept Doe 2's testimony that he didn't intentionally touch anyone in a sexual manner. Given that only speech was punished, a reasonable jury could find a substantive-due-process violation.

### E. Doe 2 was sanctioned for his protected speech in violation of the First and Fourteenth Amendments, and Virginia's free speech clause (Counts 2 and 5).

The Board violated Doe 2's state and federal free-speech rights by punishing him for the tampon joke, which was protected speech that did not disrupt the school environment. And the school's sexual harassment-policy is facially overbroad and was unconstitutionally applied to sanction Doe 2.

#### 1. The Board engaged in First Amendment retaliation against Doe 2.

The retaliation component of Doe 2's free-speech claims has three elements: (1) he engaged in protected speech, (2) Defendant responded with actions that would chill a reasonable student from repeating it, and (3) Defendant's actions were motivated by his speech. There is no dispute on the second or third element, so the only question on Doe 2's First Amendment-retaliation claim is whether the Board carried its burden to disprove any fact question as to whether any of the utterances for which Doe 2 was punished were protected speech. But in punishing Doe 2 for privately making a vulgar remark, the Board violated his constitutional rights.

---

[126] *Rucker v. Harford Cnty.*, 946 F.2d 278, 281 (4th Cir. 1991).

Public-school students do not shed their speech rights at the schoolhouse gate.[127] Schools may regulate student speech only narrowly, and where *necessary* to prevent "material and substantial disruption" at school.[128] Through clear policies, schools may proportionately punish "offensively lewd," "obscene," "indecent," and "vulgar" speeches to "captive audiences" to "disassociate itself" from speech made to "unsuspecting audiences" that "offends the sensibilities of fellow students."[129] It remains perfectly constitutional to suspend a student for two days, if that student delivers a speech to 600 students, including 14-year-olds, at a mandatory schoolwide assembly for student-council nominations, consisting of "graphic simulations of sexual activity" and "pervasive sexual innuendo" that exhorts votes for candidate by glorifying his sexual virility.[130]

Moreover, private student banter is constitutionally protected.[131] A "school official may regulate off-campus student speech only when it is reasonably foreseeable that the speech would 'make its way to the school in a meaningful way' and 'interfere[ ] with the work and discipline of the school.'"[132] There is at least a genuine issue of fact whether Doe 2's tampon jokes—made to classmates who laughed in response—would be reasonably expected to "substantially disrupt" the learning environment."[133] The Board submitted no evidence to suggest—let alone establish as a matter of law—that Doe 2 disrupted the learning environment with his tampon jokes.

---

[127] *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506 (1969).

[128] *Id.*

[129] *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685–86 (1986).

[130] *Id.* at 683.

[131] *Morse v. Frederick*, 551 U.S. 393, 405 (2007) ("Had Fraser delivered the same [lewd] speech in a public forum outside the school context, it would have been protected."); *id.* at 423 (Alito, J., concurring) (school officials cannot simply "censor any student speech that interferes with a school's 'educational mission'"). If that were the law, public schools would "possess absolute authority over their students" and become "enclaves of totalitarianism." *Tinker*, 393 U.S. at 511.

[132] *M.B. by & through Brown v. McGee*, 2017 WL 1364214, at *17 (E.D. Va. Mar. 24, 2017) (citing *Kowalski v. Berkeley Cnty. Schs.*, 652 F.3d 565, 574 (4th Cir. 2011)).

[133] *Id.* at *18; *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 933 (3d Cir. 2011) (declining "to adopt a rule that allows school officials to punish any speech by a student that takes place anywhere, at any time, as long as it is about the school or a school official, is brought to the attention of a school official, and is

## 2. The SR&R is facially overbroad in that it purports to prohibit protected speech.

A policy is unconstitutionally overbroad if it punishes not only speech that is unprotected, but protected speech as well.[134] The SR&R proscribes "[s]exual harassment (which includes … inappropriate verbal … conduct of a sexual nature that creates an … offensive environment."[135] The policy "does not contain any geographical or contextual limitations," but reaches speech without regard to whether it "occurs in a school sponsored assembly, in the classroom, in the hall between classes, or in a playground or athletic facility."[136] The policy can be (and was) read to cover speech occurring outside instructional time, and is further overbroad because it is not limited to speech that causes a substantial disruption, as required by *Tinker*. Given the great weight of authority holding that social-media speech far more offensive than a private joke cannot be proscribed by overzealous administrators, which the SR&R squarely reaches, there can be no question, particularly on this motion, that it unlawfully chills a substantial range of constitutionally protected speech.

## 3. The Board's policy is unconstitutional as applied.

For the reasons addressed with respect to the first prong of Doe 2's First Amendment-retaliation claim, the policy punished Doe 2's constitutionally protected non-disruptive speech, and is unconstitutional as-applied.

---

deemed offensive' by the prevailing authority," or punish students for privately "using a vulgar remark"); *Killion v. Franklin Reg'l Sch. Dist.,* 136 F. Supp. 2d 446, 456 (W.D. Pa. 2001) ("We cannot accept, without more, that the childish and boorish antics of a minor could impair the administrators' abilities to discipline students and maintain control."); *Klein v. Smith*, 635 F. Supp. 1440, 1442 n.4 (D. Me. 1986) ("[T]he future course of the administration of discipline [will not] dissolve, willy-nilly, in the face of the digital posturing of [a] splenetic, bad-mannered little boy.").

[134] *See City of Houston v. Hill*, 482 U.S. 451, 458 (1987).

[135] Student Rights & Responsibilities (FCSB000702–45 at 716) (Board's Ex. B, Doc. No. 101-3 at 1057–1100 at 1071).

[136] *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 216 (3d Cir. 2001); *see also Shanley v. Ne. Indep. Sch. Dist., Bexar Cty., Tex.*, 462 F.2d 960, 976 (5th Cir. 1972).

## V.    STATEMENT OF DISPUTED MATERIAL FACTS, AS ENUMERATED BY DEFENDANT[137]

3.       Banbury became the principal on February 5, 2018. During some of the material times—during the girls'-basketball scandal up through February 2, 2018—Thomas was the principal.[138]

5.       Laura Waterman was not an Associate Principal during the girls'-basketball scandal.[139]

6.       Nancy Rottenecker was an interim assistant principal from February 1 until June 30, 2018. In fall 2017, she was the interim DSA, replacing Mike Clark, who had been run out over the girls'-basketball scandal. At some material times, Rottenecker was the interim DSA.[140]

15.      Student A filled out her written statement on Friday, February 9, 2018.[141] Three days later, she brought two of her friends—Students B and C—to fill out statements as well.[142] Doe 2 agrees that their written statements accused him of misconduct, which he denies.[143]

16.      Doe 2 acknowledges that Student A reported that he grabbed her butt and then touched her crotch, but disputes that he grabbed her butt or intentionally touched her crotch.[144]

17.      Student A did not say he "directed her attention to his genitals by gesturing toward it." She accused him of "showing me his penis."[145]

18.      Doe 2 did not tell Student A to "chill out."[146]

---

[137] Plaintiffs agree that the following numbered statements from Defendant's "Undisputed Material Facts" list are indeed undisputed: 1, 2, 4, 7–14, 25–27, 30–31, 33–34, 36–38, 41–46, 48–50, 53–56, 59–60, 62–64, 66–74, and 76. The remaining items from the Defendant's list are disputed.

[138] John Doe 1 Decl. ¶ 5; Rottenecker Dep. at 30; Doe 2 Decl. at ¶ 6; Park Decl. at ¶ 16.

[139] Waterman Dep. at 54–55.

[140] Rottenecker Dep. at 16–17, 23–24; Park Decl. ¶ 11.

[141] Student Statement Form, Student A (Feb. 9, 2018) (FCSB001683).

[142] Student Statement Form, Student B (Feb. 12, 2018) (FCSB001638–39); Student State Form, Student C (Feb. 13, 2017) [*sic*] (FCSB001640).

[143] Doe 2 Decl. at ¶ 15.

[144] Doe 2 Dep. at 53–54, 72, 158–59 (Student A was rocking back and forth in her chair, bearhugged his left shoulder, and he attempted to poke her on the side where her hip is at her waistline, not near any sexual organs).

[145] Student Statement Form, Student A (Feb. 9, 2018) (FCSB001683).

[146] Doe 2 Dep. at 54.

19.     Student B reported that Doe 2 "kinda nugged [*sic*] me on the side of my breast" in Spanish class and he "tapped/put his hand on my hip/butt" at some other time in an unspecified location.[147] She reported those things, but they were not true.[148]

20.     Doe 2 disputes that he understood at the time that his comment about masturbating with fake nails was uninvited, in part because Student B was laughing after he made that joke.[149] When asked if she took it as a joke, she testified: "Yes and no."[150] She said she was "kind of just grossed out, but I didn't think anything really of it that much, that it was just kind of like awkward."[151]

21.     Student C reported that "One green day, we were decking + Ian was wearing Spandex. He said hey guys look or something like that and then grabbed his genitals through his Spandex."[152] Student C claimed that the girls were "in an 8" meaning there were eight rowers in the boat.[153] Student C reported that he did that, but it was not true."[154]

22.     Student C did not report that Doe 2 asked a group of girls how girls do not experience orgasm when using a tampon. She claimed that Doe 2 "asked me how a girl doesn't orgasm when she puts a tampon in."[155] Doe 2 did not say that, or anything like that, to Student C.[156] Doe had that conversation with two friends, neither of whom had a problem with it.[157]

23.     Doe 2 did not admit to touching Student A on her crotch (accidentally or otherwise.)[158]

---

[147] Student Statement Form, Student B (Feb. 12, 2018) (FCSB001638–39).
[148] Doe 2 Decl. at ¶ 15.
[149] Doe 2 Dep. at 82–83.
[150] Student B Dep. at 73.
[151] *Id.*
[152] Student Statement Form, Student C (Feb. 13, 2017) [*sic*] (FCSB001640).
[153] Rottenecker notes (Feb. 15, 2018) (FCSB001693) (attached as **Ex. 19**).
[154] Doe 2 Decl. at ¶ 15.
[155] Student Statement Form, Student C (Feb. 13, 2017) [*sic*] (FCSB001640).
[156] Doe 2 Dep. at 88 (I did not talk to [Student C] about the tampon ever.").
[157] *Id.* at 88–89, 155–56 (discussed tampons with two friends—not Student C—who laughed).
[158] *Id.* at 142–43.

24.     Doe 2 admitted to some, but not all, of the comments the accusers attributed to him. He denies making any tampon comments to Student C.[159]

28.     What Hoppock and Rottenecker did cannot be called an "investigation." Hoppock said she interviewed Student B,[160] which Student B denied.[161] Student B testified that no one interviewed any of the accusers.[162] Nor is there any evidence in the record to suggest that any administrator collected basic evidence to corroborate critical aspects of the accusations, such as whether any other students in the library witnessed the interaction between Doe 2 and Student A, whether any of the other students in Spanish class witnessed the interaction between Doe 2 and Student B, or whether any of the other seven crew athletes saw Doe 2 grab his crotch at practice as Student C claimed. There is also no evidence to suggest that school administrators sought to determine whether Doe 2 was even in the library on the date Student A claimed he touched her inappropriately, e.g. by collecting the library sign-in sheet, computer log-in information, or surveillance video.

29.     School administrators did not "advise him of the accusations made against him." Hoppock "gave [him] little, like, tidbits of information that [he] couldn't really work with to give her, like, response to any of her, what she was saying."[163]

30.     Hoppock said something to Doe 2 about an unidentified young lady's bottom and crotch but provided no other details.[164]

32.     He did not admit to being in the library with Student A on February 6, 2018, or to touching her as she claimed he had. Doe 2 admits that in late January, he and Student A were in the library with other students, and that he attempted playfully to poke Student A near her waistline after she

---

[159] *Id.* at 88.
[160] Hoppock Dep. at 86, 132, 240, 248–49.
[161] Student B Dep. at 8, 19–20, 38–39, 59, 67–68, 95.
[162] *Id.* at 58–60, 72–73.
[163] Doe 2 Dep. at 76.
[164] *Id.*

bearhugged his shoulder, but that she rocked back in her chair.[165] He did not touch her on her

crotch.[166] Hoppock failed to interview any of the other students or library staff present to attempt to

confirm Doe's version of events.[167]

35.     Hoppock and Rottenecker did not advise Doe 2 and his parents of who was making the

allegations, specifically as to Student C, to whom Doe 2 never spoke about tampons.[168]

47.     Doe 2's mother did not speak at the hearing, and the hearing officers cut off Doe 2, and cut

off his father when he attempted to question his son about what had happened.[169]

51.     Doe 2 did not "generally admit his comments to female students about masturbation and

orgasm": he expressly denied making any sexual comment to Student C.[170]

52.     Doe 2 did not admit that he touched Student A "between her belly button and pelvic area"

on purpose. He did not touch her there on purpose.[171]

54.     Doe 2 did not admit that he asked "female students" about how a girl does not orgasm

when she uses a tampon. He testified that he asked two of his friends and his then-girlfriend that

question (not Student C).[172]

57.     Doe did not admit that his comments were offensive; his intention was to joke around.[173]

And his friends took no offense.[174]

58.     Doe 2 did not admit that he did not think about the effect that his speech would have in a

---

[165] *Id.* at 53–54, 72, 158–59.

[166] *Id.*

[167] Hoppock Dep. at 199–200.

[168] John Doe 1 Decl. at ¶¶ 8–9; Jane Doe 1 Decl. at ¶¶ 5, 10; Doe 2 Decl. at ¶¶ 9, 15; Doe 2 Dep. 88.

[169] Doe 2 Dep. at 157–58; John Doe 1 Decl. at ¶ 18; Jane Doe 1 Decl. at ¶ 14; Hr'g Tr. (Board Ex. B, Doc. No. 101-1).

[170] Doe 2 Dep. at 88.

[171] *Id.* at 53–54, 72, 158–59.

[172] *Id.* at 88–91, 95–97.

[173] *Id.* at 83, 97, 148.

[174] *Id.* at 91.

general sense. He admitted that he did not think about what the effect would be when he asked his friends (none of whom were Student C) the tampon-orgasm question.[175]

61.     The hearing officers did not "consider all of the documents and information submitted, including the polygraph reports." It is clear from their deposition testimony[176] that they discounted Doe 2's evidence because they deemed his polygraph results "inadmissible in court" even though Hoppock's hearsay accounts of the accusers' written accusations would be inadmissible in court.

65.     Doe 2 disputes that there was anything "successful" about his time at the alternative school. It was a miserable and traumatizing experience. He came home and cried every day and regularly considered taking his own life.[177]

75.     The Fairfax circuit court proceeding was not a forum for litigating "all of Doe's various challenges" to that state action, but instead an administrative appeal where he was afforded no discovery or opportunity otherwise litigate his claims. Certain key facts about the process Doe 2 received—such as Hoppock's acknowledgment that a number of critical statements she made to the hearing officers were not accurate—are known only because of discovery in this action and were not considered in the administrative proceedings.[178]

## VI.  Conclusion

Doe 2 deserves his day in court to—for the first time—fairly contest the accusations that have derailed his life. The hearing officers relied on the credibility of an assistant principal who investigated nothing. The school took the accusers at their written word—no one conducted even the most basic of interviews that might have revealed whether these young women were fabricating or exaggerating their accounts to try to get Doe 2 removed from the crew team. And the sanction of

---

[175] Hr'g Tr. at 46 (Board Ex. B, Doc. No. 101-1 at 781).
[176] Anderson Dep. at 80; Kreloff Dep. at 64.
[177] Doe 2 Dep. at 128–30; John Doe 1 Decl. at ¶ 19; Jane Doe 1 Decl. at ¶ 17; Doe 2 Decl. at ¶ 18.
[178] Hoppock Dep. at 244, 251. *See also* Pl.'s Resp. on Preclusion, Doc. No. 79 at 617.

permanently removing Doe 2 from his school for a few off-color remarks shocks the conscience and create a strong inference of bias plaguing these proceedings. In light of the tidal wave of bad publicity Lake Braddock was weathering over the girls'-basketball scandal in the weeks leading up to the accusations against Doe 2, the wild and disproportionate overreaction to the accusations against him violate his Title IX, due process, and First Amendment rights.

Considering the totality of the circumstances, including the flaws in the investigation and hearing process and the charged, "hypervigilant" and "hypersensitive" environment in the aftermath of the girls'-basketball scandal, Doe 2 has presented evidence to plausibly establish a causal link between his discipline and gender bias, to show that his penalty was skewed because of his gender, that he was denied procedural and substantive due process, and that his speech rights were transgressed. The Court should deny the Board's motion.

Dated: April 19, 2019

THE CHANDRA LAW FIRM LLC

*/s/ Subodh Chandra*
Subodh Chandra, admitted *pro hac vice*
Donald Screen, admitted *pro hac vice*
Ashlie Case Sletvold, admitted *pro hac vice*
Patrick Kabat, admitted *pro hac vice*
The Chandra Law Building
1265 West Sixth Street, Suite 400
Cleveland, OH 44113
216/578-1700
Subodh.Chandra@ChandraLaw.com
Donald.Screen@ChandraLaw.com
Ashlie.Sletvold@ChandraLaw.com
Patrick.Kabat@ChandraLaw.com

*Counsel for Plaintiffs*

Respectfully submitted,

UNGVARSKY LAW, PLLC

*/s/ Edward J. Ungvarsky*
Edward J. Ungvarsky (VSB # 83014)
114 North Alfred Street
Alexandria, VA 22314
571/207-9710
ed@ungvarskulaw.com

I certify that on April 19, 2019, I filed the above document using the Clerk's electronic-filing system, which will send notification to all counsel of record.

_/s/ Edward J. Ungvarsky_
_Counsel for Plaintiffs_