IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JOHN DOE 2, by and through his father and )
   next friend, JOHN DOE 1, )
                                                          )
   Plaintiffs, )
                                                          )
v. ) 1:18-cv-846 (LMB/TCB)
                                                          )
THE FAIRFAX COUNTY SCHOOL )
   BOARD, et al., )
                                                          )
   Defendants. )

## MEMORANDUM OPINION

Before the Court is defendant Fairfax County School Board's Motion for Summary Judgment [Dkt. No. 100], which has been fully briefed and argued. For the reasons stated in this Memorandum Opinion, the Motion will be granted.

## I. BACKGROUND

Plaintiff John Doe 2 (the "Student"), a 16-year-old student, and John Doe 1, the Student's father and next friend (collectively, "plaintiffs"), have filed a five-count Complaint against the Fairfax County School Board (the "School Board" or "defendant"),[1] alleging violations of Title IX under 20 U.S.C. § 1681 (Count I), the First and Fourteen Amendments pursuant to 42 U.S.C. § 1983 (Counts II and III, respectively), and the Due Process and Free Speech Clauses of the Virginia Constitution (Counts IV and V, respectively). Compl. [Dkt. No. 1]. For relief, plaintiffs seek an injunction restraining defendant from continuing to enforce any punishment against the

---

[1] The Complaint was initially also brought against the Fairfax County Public Schools and John Banbury, Eileen Hoppock, and Nancy Kreloff in their official and individual capacities. See Compl. [Dkt. No. 1]. Those defendants' Motion to Dismiss was granted on September 9, 2018, leaving the School Board as the only defendant in this action. See Order [Dkt. No. 20].

Student and including any of the hearing officers' findings and sanctions on the Student's academic record, as well as damages, attorneys' fees, and costs. Id. at 12–13.

This lawsuit arises out of allegations made by three of the Student's female classmates at Lake Braddock Secondary School ("Lake Braddock") concerning the Student's inappropriate touching and comments. Specifically, the girls alleged that on February 6, 2018, the Student touched the butt and crotch of Student A while they were in the library;[2] that he touched Student B on her breast, hip, and butt while in Spanish class and commented on Student B's fake fingernails by saying "you'd cut yourself if you fingered yourself with those nails"; and that at crew practice he touched his genitals through his spandex and asked Student C "how a girl doesn't orgasm when she puts a tampon in." Id. ¶ 10.

The three female students approached a vice principal to report the Student on February 12, 2018. Id. ¶ 9. Three days later, the Student was removed from class and he, along with his parents, met with school administrators to discuss the allegations. In that meeting, he explained that he had touched Student A accidentally,[3] denied touching Student B, and admitted to making both the fingernail and tampon statements but stated that the tampon statement was a joke and was made to two other female friends, not to Student C. Id. ¶¶ 11–15; Def.'s Brief in Supp. of Mot. for Summ. J. [Dkt. No. 101] ("MSJ") ¶ 35, at 7. The Student was subsequently suspended for ten days. Compl. ¶ 16. The Student and his parents appealed the suspension on February 21, 2018. MSJ ¶ 40, at 7.

---

[2] The allegation also stated that the Student showed Student A his penis, but Student A clarified that she did not mean that the Student had exposed himself, but rather that he had "gestured towards his crotch." Compl. ¶ 10(a); Mar. 9 Hr'g Tr. [Dkt. No. 101-1] 28:12-18.
[3] During the hearing, the Student said that he and Student A were playing, and Student A pushed and touched him as well. Compl. ¶ 19.

2

A hearing was held on March 9, 2018. Compl. ¶ 17. Plaintiffs, along with counsel, were present at the hearing conducted by hearing officers Nancy Kreloff and J.D. Anderson. Id. Assistant Principal Eileen Hoppock and Associate Principal Laura Waterman presented the allegations. Id. ¶ 18. In the Student's defense, plaintiffs provided a psychosexual risk assessment, two polygraph reports, and character reference letters. Id. ¶ 25.

On March 23, 2018, Kreloff issued a decision finding that the Student had "committed serious repeated offenses in violation of School Board policy by engaging in improper and offensive touching of female students and sexual harassment of female students." Id. ¶ 29. As a sanction, the Student was removed from Lake Braddock and reassigned to an "alternate educational setting within [the Fairfax County Public School] system." Id. ¶ 32. The Student successfully completed the 2017–2018 school year at Bryant Alternative Learning Center and was reassigned to South County High School for the 2018–2019 school year. MSJ ¶ 65, at 10.[4]

Plaintiffs appealed the hearing officers' decision to the School Board on March 29, 2018, which denied the appeal on April 12, 2018. Compl. ¶ 33; MSJ ¶ 66, at 10. On May 11, 2018, plaintiffs petitioned the Circuit Court of Fairfax County to review the School Board's decision. MSJ ¶ 73, at 11. Under Virginia law, a circuit court must sustain the School Board's action "unless the school board exceeded its authority, acted arbitrarily or capriciously, or abused its discretion." Id. ¶ 74 (citing Va. Code. Ann. § 22.1-87). At a hearing on December 14, 2018, the circuit court denied the Petition for Review, ruling that plaintiffs "failed to show that the School Board exceeded its authority, acted arbitrarily or capriciously, abused its discretion or violated any of John Doe 2's due process rights." Id. ¶¶ 75–76 (citing Dkt. No. 62-1). Although plaintiffs

---

[4] During oral argument, the Student indicated that he was not interested in returning to Lake Braddock for his senior year. May 3 Hr'g Tr. [Dkt. No. 127] 5:20-24.

3

initially appealed the decision, they have abandoned that appeal. May 10 Hr'g Tr. [Dkt. No. 132] 8:20-24. On July 6, 2018, while the Fairfax Circuit Court matter was pending, plaintiffs filed this Complaint, and on March 22, 2019 defendant moved for summary judgment.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate where the record demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the Court must view the record "in the light most favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th Cir. 2012), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to overcome summary judgment, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009). Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. Moreover, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment. Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). Instead, the dispute must be both "material" and "genuine," meaning that it must have the potential to "affect the outcome of the suit under the governing law." Id.

B. **Analysis**

1. **Preclusive Effect of State Court Ruling**[5]

Defendant first argues that the Fairfax County Circuit Court's conclusion that defendant had not violated the Student's due process rights precludes plaintiffs from relitigating the issue in this Court. In Virginia, "[t]he doctrine of collateral estoppel precludes the same parties to a prior proceeding from litigating in a later proceeding any issue of fact that actually was litigated and was essential to the final judgment in the first proceeding," and this doctrine applies notwithstanding that the causes of action or the relief sought in the two proceedings may differ. Whitley v. Commonwealth, 260 Va. 482, 489 (2000) (citations omitted). In Whitley, the Supreme Court of Virginia enumerated four elements that must be satisfied before a party can invoke the doctrine of collateral estoppel, or issue preclusion:

> (1) the parties to the two proceedings must be the same; (2) the factual issue sought to be litigated must have been actually litigated in the prior proceeding; (3) the factual issue must have been essential to the judgment rendered in the prior proceeding; and (4) the prior proceeding must have resulted in a valid, final judgment against the party to whom the doctrine is sought to be applied.

Id. It is the party seeking to preclude a factual issue that bears the burden of demonstrating that these four elements are satisfied. See Bates v. Devers, 214 Va. 667, 671 (1974). Issue preclusion applies "only when the issues in each action are identical, and the issues are not identical when the legal standards governing their resolution are significantly different." SAD Inst., Inc. v. World Programming Ltd., 874 F.3d 370, 380 (4th Cir. 2017) (citation omitted).

---

[5] Plaintiffs, in their opposition to summary judgment, and defendant, in its memorandum and reply in support, incorporated by reference their previous briefing on this issue. See Dkt. Nos. 62, 79, 80 & 84.

5

Under Rule 1:6(a) of the Rules of the Virginia Supreme Court, which addresses res judicata, or claim preclusion,

> [a] party whose claim for relief arising from identified conduct, a transaction, or an occurrence, is decided on the merits by a final judgment, shall be forever barred from prosecuting any second or subsequent civil action against the same opposing party or parties on any claim or cause of action that arises from that same conduct, transaction, or occurrence, whether or not the legal theory or rights asserted in the second and subsequent action were raised in the prior lawsuit, and regardless of the legal elements or the evidence upon which any claims in the prior proceeding depended, or the particular remedies sought. A claim for relief pursuant to this rule includes those set forth in a complaint, counterclaim, cross-claim or third-party pleading.

Va. Sup. Ct. R. 1:6(a). Initially, plaintiffs argue that the proceeding before the state court was a petition under Virginia Code § 22-1.87, not a "claim for relief"; however, a judge in the Eastern District of Virginia has held that a petition under that same section of the Virginia Code was clearly a "civil proceeding" and thus was covered by Rule 1:6. See Davison v. Rose, No. 1:16cv540, 2017 WL 3251293, at *6 (E.D. Va. Jul. 28, 2017). To prevail on its preclusion claim, defendant must establish that "(1) there was a final judgment issued on the merits of a prior suit; (2) there is identity of parties between the prior and present suits; and (3) the claim was brought in the prior proceeding or arose out of the same conduct, transaction, or occurrence as the subject of the prior proceeding." Id. at *7 (citation omitted). Plaintiffs do not dispute the first and second elements but argue that they could not have brought the claims raised in this federal lawsuit, such as their Title IX claim, in the prior state court proceeding. Pls.' Resp. Opposing Def.'s Br. on Preclusion [Dkt. No. 79] 11–15. Moreover, they point to the significant differences between the two proceedings. For example, in the state court proceeding, plaintiffs were not entitled to discovery, and review was limited to the record. Id. at 13–15.

Plaintiffs had to file the state court petition to preserve their due process claims. When they moved to stay the state court proceeding while they prosecuted this federal lawsuit,

6

defendant essentially contradicted its preclusion argument by opposing plaintiffs' motion to stay on the grounds that collateral estoppel would not apply because "[n]o factual issue yet to be litigated in the federal lawsuit will be 'litigated' in this appeal." Dkt. No. 79-1 at 4. The state court was confined to the record before the School Board and could only overturn decisions that were arbitrary and capricious, whereas the review available in this federal litigation is necessarily broader and involves more than just a due process claim. Therefore, the state court's decision does not preclude plaintiffs from pursuing their claims in this Court.

### 2. Title IX (Count I)

In Count I, plaintiffs allege that the School Board treated the Student differently because of his gender. Specifically, plaintiffs argue that the Student was treated more aggressively because he was a male student accused of sexual misconduct by female students and that the School Board refused to believe him because of his gender. Compl. ¶¶ 39–42.

Title IX prohibits any school receiving federal funds from discriminating on the basis of sex. 20 U.S.C. § 1681. Students may enforce Title IX through an implied private right of action. Cannon v. Univ. of Chi., 441 U.S. 677, 688–89 (1979). A dispute over a school disciplinary proceeding on the grounds of gender bias "can be expected to fall generally within two categories" developed by the Second Circuit in Yusuf v. Vassar College, 35 F.3d 709, 715 (2d Cir. 1994). First, under the "erroneous outcome" theory, a plaintiff can claim that he or she is innocent and was "wrongly found to have committed an offense." Id. Second, under the "selective enforcement" theory, "regardless of the student's guilt or innocence," a plaintiff can argue that "the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." Id.

      a. <u>Erroneous Outcome</u>

      Defendant argues that the erroneous outcome theory is not available to plaintiffs because, at a minimum, the Student admitted to inappropriate speech. Therefore, he cannot claim to have been "innocent and wrongly found to have committed an offense." <u>Yusuf</u>, 35 F.3d at 715. In his declaration, the Student states that he "did not sexually harass any of my classmates . . . did not intentionally touch Student A on her butt or crotch . . . did not touch Student B on the side of her breast or on her hip or butt . . . did not grab my genitals at crew practice . . . [and] never spoke to Student C about tampons." John Doe 2 Decl. [Dkt. No. 107-6] ¶ 15. It is undisputed, however, that the Student made the tampon and fingernail statements, as well as touched Student A between her belly button and pelvic area. Mar. 9 Hr'g Tr. [Dkt. No. 101-1] at 39:4–40:17. The Student does not admit that the conceded conduct amounted to sanctionable misconduct, declaring that he "did not sexually harass any of my classmates" and "did not touch anyone inappropriately," but merely "made a couple of juvenile comments." John Doe 2 Decl. ¶ 17.

      In addition to claiming innocence, plaintiffs must have evidence in the record (1) sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and (2) establishing a particularized causal connection between the flawed outcome and gender bias. See <u>Doe v. Miami Univ.</u>, 882 F.3d 579, 592 (6th Cir. 2018). The first element can be satisfied by (1) pointing to procedural flaws in the investigatory and adjudicative process, (2) identifying inconsistencies or errors in the findings, or (3) challenging the overall sufficiency and reliability of the evidence. See <u>Doe v. Marymount Univ.</u>, 297 F. Supp. 3d 573, 584 (E.D. Va. 2018). Plaintiffs have satisfied this element. The accusers were never interviewed beyond their initial meeting with Assistant Principal Rottenecker on February 12 when they filed their written complaints. See Hoppock Dep. [Dkt. No. 121] at 200:3, 210:15-17. Although Assistant Principal

Hoppock stated at the March 9 hearing that she had interviewed the students, she has since acknowledged that she did not interview Student A or Student C. Id. at 248:9–249:21. Although Hoppock claims to have interviewed Student B, Student B denies it. Student B Dep. [Dkt. No. 107-10] at 38:14-22. At the March 9 hearing, Hoppock stated that there was a male witness to an alleged breast touching; however, in her deposition, she admitted that was an "incorrect statement." Hoppock Dep. at 251:19-20. Plaintiffs have demonstrated numerous deficiencies with the investigatory process that were relied upon and compounded at each stage of the disciplinary proceeding. See Doe v. Washington & Lee Univ., No. 6:14cv00052, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (denying a motion to dismiss an erroneous outcome claim where the defendant did not interview two of the plaintiff's proffered witnesses and relied only on summaries of witness statements).

Furthermore, defendant did not investigate any possible exculpatory evidence, including that the Student was not in the library on the day he is alleged to have touched Student A. Hoppock neither interviewed Student A, Hoppock Dep. at 144:9-16, nor checked the library sign-in sheet for February 6, 2018, the day the Student is alleged to have touched Student A, id. at 199:11-16. Although the sign-in sheet shows the Student's signature, he adamantly denies that the signature is his, claiming that he was not in the library on that day, as he had music rehearsal. John Doe 2 Decl. ¶¶ 12–13; John Doe 1 Decl. [Dkt. No. 107-2] ¶ 16; John Doe 2 Dep. [Dkt. No. 107-13] at 67:2-22. Although plaintiffs have demonstrated ways in which the investigation and subsequent hearing were flawed, satisfying the first element, they have not produced sufficient evidence to establish a "particularized causal connection" between gender bias and the flawed investigation and outcome, the second requirement. Marymount, 297 F. Supp. 3d at 583.

Initially, plaintiffs' first theory of gender bias referred to the Office of Civil Rights "Dear Colleague" letter, which they claimed encouraged schools to punish alleged male sexual harassers harshly. Compl. ¶ 41. The present theory is that a scandal involving the Lake Braddock girls' basketball coach created an inhospitable environment for males accused of sexual misconduct. Although this theory is more particularized than the first, there is no direct evidence supporting it, and the circumstantial evidence is, at best, speculative. For example, Assistant Principals Rottenecker and Hoppock, as well as Associate Principal Waterman, admitted being aware of the basketball coach scandal; however, this general awareness was the extent of their knowledge. See Rottenecker Dep. [Dkt. No. 120] at 31:3–34:7; Hoppock Dep. at 77:14–79:6; Waterman Dep. [Dkt. No. 140-1] at 55:10–57:15. Karl Kearns, Lake Braddock's Director of Student Activities who was hired after his predecessor left because of the scandal, admitted knowing more about the scandal and described an atmosphere that was "hyper-vigilant" towards sexual harassment and "hyper-sensitive to anything that was athletic related." Kearns Dep. [Dkt. No. 117] at 32:2-9. Although Kearns had more knowledge of the scandal than the administrators, he had no involvement with the investigation or discipline of the Student other than forwarding an email from Rottenecker to the Student's crew coach, Tracy Shakespeare. Dkt. No. 101-3 at FCSB000678-79. That evidence is not sufficiently particularized to create a genuine issue of fact as to anti-male bias.

Plaintiffs cite Doe v. Washington & Lee University, but that case is distinguishable because that university's Title IX officer had given a presentation that suggested bias against males in investigations of sexual assault allegations. 2015 WL 4647996, at *10. Here, plaintiffs have not offered any evidence of statements made by any member of the disciplinary tribunal or by any school officials exhibiting anti-male bias or identified any evidence of a pattern of

decisionmaking tending to show that male students were disciplined more harshly than female students. See id. (citing Yusuf, 35 F.3d at 715). Because plaintiffs have failed to raise a genuine issue of material fact as to the gender bias of defendant, the erroneous outcome claim fails.

    b. Selective Enforcement

To support a claim of selective enforcement, a male plaintiff "must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the [school]." Rossley v. Drake Univ., 342 F. Supp. 3d 904, 931 (S.D. Iowa 2018) (internal quotation marks and citation omitted) (finding that an accused student and an accuser can be compared to show selective enforcement only if they both initiate or attempt to initiate a complaint against each other); see also Doe v. Cummins, 662 F. App'x 437, 452 (6th Cir. 2016). Although the Fourth Circuit has not addressed whether Yusuf requires a comparator to sustain a selective enforcement claim, judges in both the Eastern and Western Districts of Virginia have held that it does. See Sheppard v. Visitors of Va. State Univ., No. 3:18cv723, 2019 WL 1869856, at *4–5 (E.D. Va. Apr. 25, 2019) (dismissing a selective enforcement claim brought by a male student for failure to allege that similarly situated female students who engaged in the same conduct were treated more favorably because there was a few months' delay in disciplining the female students); Streno v. Shenandoah Univ., 278 F. Supp. 3d 924, 932 (W.D. Va. 2017) (dismissing a selective enforcement claim brought by a gay person for failure to allege that a similarly situated straight person was treated more favorably by the school).

Plaintiffs have failed both to allege and to present any evidence supporting a claim that a female student similarly situated to the Student was treated more favorably by defendant.[6] In

---

[6] The Complaint alleges that the Student was treated "differently due to his gender when he was punished for touching a female student when the same female student touched him," Compl.

11

their Opposition, plaintiffs state that the Student "testified that his female classmates are not punished for similar statements," Pls.' Resp. to Mot. for SJ [Dkt. No. 106] ("Opp'n") 16, yet all the Student said in his deposition was that he has "seen and heard girls say comments like this to boys [and] girls . . . who have touched boys in inappropriate areas," John Doe 2 Dep. at 109:19-21. The Student was not sure whether those instances were reported, id. at 110:7-15, and did not know of any cases in which the School Board "refused to believe a male student because he was male," id. at 116:47. These vague statements are insufficient to create a genuine dispute of material fact. Therefore, the selective enforcement claim fails as well. Accordingly, defendant will be granted summary judgment on Count I.

### 3. First Amendment (Count II)

Although students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," First Amendment rights are "applied in light of the special characteristics of the school environment." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969). Student conduct which "materially disrupts classwork or involves substantial disorder or invasion of the rights of others" is "not immunized by the constitutional guarantee of freedom of speech." Id. at 513. School officials can even "prohibit the use of vulgar and offensive terms as part of their role in teaching students the fundamental values of habits and manners of civility essential to a democratic society" without needing to undertake Tinker's substantial disruption analysis, Hardwick v. Heyward, 711 F.3d 426, 435 (4th Cir. 2013) (internal quotation marks omitted) (quoting Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675,

---

¶ 39, but the Student never made any complaints against that female student or alleged that she touched him in an inappropriate or sexual manner. Pl.'s Resps. to Def.'s Reqs. for Admis. to Pl. [Dkt. No. 101-5] ¶ 3. Therefore, this female student is not similarly situated. See Rossley, 342 F. Supp. 3d at 933 ("But if the accused student did not similarly initiate or attempt to initiate a complaint against his or her accuser, the two cannot be compared.").

12

683, 681 (1986)), in light of the paramount "interest in protecting minors from exposure to vulgar and offensive spoken language," Fraser, 478 U.S. at 684.

The Lake Braddock Student Rights and Responsibilities ("SR&R") booklet defines "sexual harassment" to include "unwelcome sexual advances, regardless of sexual orientation; requests for sexual favors; and other inappropriate verbal, electronic, or physical conduct of a sexual nature that creates an intimidating, hostile, or offensive environment." Dkt. No. 101-4 at FCSB000716.[7] The Student does not deny the vulgarity of his comments but does distinguish his tampon statement, which he claims was made in private, from the circumstances in Fraser, where the offensive comments were made in a high school assembly attended by 600 students. See 478 U.S. at 681. The Student argues that because his comments were made in a private conversation with a limited audience, they were neither disruptive nor invasive of the rights of others. That claim is contradicted by the fact that three female students were sufficiently upset that they reported the comments to school administrators. Compl. ¶ 10(c). Regardless of the context in which the statements were made, under the Supreme Court's holding in Fraser, a school can prohibit "vulgar and offensive terms" without even needing to analyze whether those terms were disruptive or invaded the rights of others. 478 U.S. at 683. Given this authority, to the extent plaintiffs argue that the Student's speech should have been protected by the First Amendment because it was not disruptive, that argument fails.

---

[7] The Student and his parents received a copy of the SR&R booklet for the 2017–2018 school year. Dkt. No. 101-3 at FCSB000681. The Student took a quiz on the SR&R booklet, affirming his knowledge that "[m]aking sexual comments toward another student or asking for sexual favors is not acceptable and students should report this to school staff members" and that "[a] student who touches another student intentionally in his or her private areas will face disciplinary action and may be reported to the police." Id. at FCSB000682.

13

Plaintiffs also argue that the School Board's sexual harassment policy, as expressed in the SR&R booklet that prohibits "verbal . . . conduct of a sexual nature that creates an . . . offensive environment," Compl. ¶ 48; Dkt. No. 101-4 at FCSB000716, is unconstitutional because it is vague and overbroad. Plaintiffs argue that this policy is vague because it does not delineate what conduct is specifically prohibited and is overbroad because it reaches a substantial amount of constitutionally protected conduct.

Both the vagueness and overbreadth doctrines are designed to "prevent self-censorship because of fear of a law's enforcement" and to ensure that a law does not "deter constitutionally protected and socially desirable conduct." Hardwick, 711 F.3d at 442 (citation omitted). Despite these concerns, the vagueness doctrine applies "less rigidly in the school context." M.B. ex rel. Brown v. McGee, No. 3:16cv334, 2017 WL 1364214, at *7 (E.D. Va. Mar. 24, 2017) (citation omitted).[8] Although school rules must be "sufficiently clear and specific that a reasonable person would understand what is prohibited or expected," id. (citation omitted), a public school's disciplinary rules "need not be as detailed as a criminal code which imposes criminal sanctions" because of the school's need "to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process," Fraser, 478 U.S. at 686. Given the "duties and responsibilities" of public schools, "the overbreadth doctrine warrants a more hesitant application in the public school setting than in other contexts." Newsom v. Albermarle Cty. Sch. Bd., 354 F.3d 249, 258 (4th Cir. 2003) (citation omitted).

The School Board's use of "offensive" in the SR&R booklet tracks the language used in Tinker and Fraser and is therefore permissible. In Hardwick, the Fourth Circuit held that a dress

---

[8] The case cited by the Student to support his overbreadth challenge, Does 1–5 v. Cooper, 40 F. Supp. 3d 657 (M.D.N.C. 2014), involves a statute placing location restrictions on sex offenders and is therefore not applicable to the school setting.

14

code that prohibited "offensive" clothing was not overbroad: "[b]ecause the dress codes are guided by Tinker and Fraser, there is no real danger that they compromise the First Amendment rights of other students." 711 F.3d at 441 (citation omitted). Because the same term is utilized here, there is similarly no real danger that the SR&R booklet compromises the First Amendment rights of other students. Furthermore, the SR&R booklet does not prohibit "any conduct" that creates an "offensive environment," as plaintiffs allege. Compl. ¶ 48. The sexual harassment policy prohibits "conduct of a sexual nature" that creates an "offensive environment." Dkt. No. 101-4 at FCSB000716. This language is sufficiently clear and specific such that a reasonable person would understand what is prohibited. Accordingly, the school's sexual harassment policy is neither vague nor overbroad, and defendant will be granted summary judgment as to Count II.[9]

### 4. Fourteenth Amendment (Count III)

To allege a claim for a violation of due process, plaintiffs must show that the Student had (1) a protected liberty or property interest, (2) of which defendants deprived him, (3) without due process. See Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). The Supreme Court has held that school disciplinary hearings implicate a student's liberty or property interest and that students must receive due process. See Goss v. Lopez, 419 U.S. 565, 573 (1975).

For a suspension of ten days or less, due process requires that a student receive oral or written notice of the charges against him and an opportunity to present his story. Broussard v. Sch. Bd. of Norfolk, 801 F. Supp. 1526, 1532 (E.D. Va. 1992) (citing Goss, 419 U.S. at 581). All that is required is "at least an informal give-and-take between student and disciplinarian,

---

[9] In their Opposition, plaintiffs allege for the first time that defendant retaliated against the Student for engaging in First Amendment protected activity. Opp'n 22. Even if this last-minute allegation were before the Court, it would fail because the speech is not protected because it is offensive.

preferably prior to the suspension." Goss, 419 U.S. at 584. There is no dispute that the Student was provided oral notice of the allegations against him on February 15, 2018 and was given an opportunity to tell his side of the story, which he did, confirming and denying various allegations. Compl. ¶¶ 10–15. After this opportunity to respond to the allegations, the Student was suspended for ten days. Id. ¶ 16. Although the Student claims that this suspension was given without "any due process protections," that interaction was all that was required. Id. The Student argues that he was only confronted with vague allegations, but even in that first interaction, he admitted to making the tampon and fingernail statements, John Doe 2 Dep. at 82:12-20 & 93:12-17, and touching Student A, id. at 75:22–76:21. The context in which these admissions were made more than satisfied an "informal give-and-take." Goss, 419 U.S. at 584.

Plaintiffs allege that the hearing the Student received after his suspension was insufficient to satisfy due process. Although Goss provided articulable procedural requirements for a suspension of ten days or less, no court has yet "prescribed a precise procedural paradigm that is required" when a student is removed from a particular school, Woods v. Winchester Sch. Bd., No. 98-213, 1999 WL 33732641, at *7 (Va. Cir. July 15, 1999); however, the Virginia Supreme Court has held that so long as the student, his parents, and counsel knew the reasons why the student had been suspended, were able to participate during the hearing, and were notified of their right to appeal, the student's due process rights were not abridged when he was expelled post-hearing, Wood v. Henry Cnty. Pub. Sch., 255 Va. 85, 92 (1998). Although the Sixth Circuit may now require cross-examination in a school disciplinary proceeding where the proceeding hinges on a question of credibility, Doe v. Baum, 903 F.3d 575, 578 (6th Cir. 2018), the Fourth Circuit has not found "a basis in the law" for "importing" the right to cross-examination "into the academic context," Butler v. Rector & Bd. of Victors of Coll. of William & Mary, 121 F. App'x

515, 520 (4th Cir. 2005) (per curiam). Furthermore, the Fifth Circuit has held that transfer to an alternative program did not constitute a denial of access to public education, "not even temporarily," because the student remained in a public school, albeit an "alternative" one. Nevares v. San Marcos Consol. Indep. Sch. Dist., 111 F.3d 25, 26 (5th Cir. 1997).

In this case, a hearing was held on March 9, 2018, at which the Student was represented by counsel. Compl. ¶ 17. Defendant presented the accounts of the three female accusing students and their written statements, as well as accounts of statements made by corroborating male witnesses to school administrators. Id. ¶¶ 18, 21. Plaintiffs presented a psychosexual risk assessment showing the Student posed a minimal risk, two polygraph reports indicating the Student was truthful, and character reference letters. Id. ¶¶ 25–27. Both the Student and his father testified at the hearing. Id. ¶ 28. On March 23, 2018, a decision finding that the Student had violated School Board policy was issued, and he was reassigned to an "alternative educational setting." Id. ¶¶ 29–32. The Student appealed that decision to the School Board, which denied the appeal on April 12, 2018. Id. ¶ 33. These facts, which are not disputed, establish that the Student was afforded the notice and opportunity to be heard which are required for due process. His allegation that he was "cut off" or that the hearing was ended abruptly are insufficient to create a genuine dispute as to whether there was a due process violation. John Doe 2 Dep. at 104:17-19; John Doe 1 Decl. ¶ 18. Further undercutting any due process claim is that the Student was transferred to another educational setting, rather than being expelled. Although the Student has described many deficiencies in the School Board's procedures, these flaws do not rise to the level of a denial of due process. Therefore, the defendant will be granted summary judgment as to Count III.

### 5. State Constitutional Claims (Counts IV and V)

Defendant argues that because the Virginia Constitution goes no further than the United States Constitution with respect to due process and free speech law, plaintiffs' claims under the Virginia Constitution should be dismissed for the same reasons justifying dismissal of their federal counterparts. Virginia state courts have "consistently held that the protections afforded under the Virginia Constitution are co-extensive with those in the United States Constitution." Lilly v. Commonwealth, 50 Va. App. 173, 184 (2007) (citation omitted). Analysis under the "federal equal protection and due process principles, therefore, subsume any analysis of parallel provisions in the Virginia Constitution." Id. Plaintiffs offer no rebuttal to this argument, which the Court finds meritorious. Accordingly, defendant will be granted summary judgment as to Counts IV and V.

### III. CONCLUSION

For the reasons stated above, defendant's Motion for Summary Judgment [Dkt. No. 100] will be granted by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 29th day of May, 2019.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge